In the Matter of AMOS H. STEPHENS, an Attorney, Respondent.

First Department, March 7, 1924.

Attorney and client — disciplinary proceedings — attorney disbarred for paying, as attorney for corporation, $20,500 to lawyer in Boston to be used to stop criminal investigation then being conducted against corporation by district attorney in Boston.

An attorney at law disbarred from practice for unprofessional conduct in that, while acting as the attorney for a corporation having an office in New York, he paid $20,500 to a lawyer in Boston for the purpose of having that lawyer

use his influence with the district attorney in Boston, with whom he was in close personal and political relationship, to drop a criminal investigation then being conducted in Boston against the corporation.

DISCIPLINARY proceedings instituted by the Association of the Bar of the City of New York.

*Einar Chrystie*, for the petitioner.

*Henry A. Wise* [*Townsend Scudder* of counsel], for the respondent.

CLARKE, P. J.:

The respondent was admitted as an attorney and counselor at law in April, 1891, at a General Term of the Second Department. The substance of the charge of unprofessional conduct as stated in the petition is as follows: In June, 1916, the respondent became counsel for the Emerson Motors Company, a corporation formed for the purpose of engaging in the business of manufacturing automobiles. The stock of said corporation was placed on sale in several cities, including New York and Boston, and advertisements were inserted in the newspapers of those cities. Robert P. Matches, a broker doing business as Robert P. Matches & Co. in Boston, had charge of the sale of the stock in Boston. The district attorney of Suffolk county, Mass., in September, 1916, caused an investigation to be made regarding the methods used by the Emerson Motors Company to sell its stock; Matches learned of the investigation and notified Willis G. Emerson, president, in the city of New York, that the investigation was pending. On October 2, 1916, the respondent was sent to Boston by Emerson to ascertain the facts regarding the investigation. Respondent thereupon interviewed Matches in Boston and was told what Matches' personal attorney, Carroll, had learned of the matter. Respondent thereupon interviewed Mr. Carroll and was told by him substantially that Daniel H. Coakley, a Boston attorney, who was a close personal and political friend of the district attorney, Joseph C. Pelletier, could be of assistance to the company in the pending investigation. Carroll brought about an interview between respondent and Coakley, during which respondent requested Coakley to arrange a meeting with the district attorney in order that he might personally present the facts to him regarding the sale of the company's stock. The meeting was arranged and had. At an immediately subsequent interview with Mr. Coakley, the respondent discussed with him the possibility of having the district attorney pigeon-hole or drop the investigation, and in the course of the conversation Coakley said he would undertake to stop the investigation upon the payment to him of $500 immediately and the further sum of $20,000 in the event that he succeeded. The respondent returned to New York, and on October

4, 1916, reported what had taken place in Boston to the officers of the company. Respondent thereafter went to Boston with $20,500 in cash and gave it to Carroll with instructions to pay $500 to Coakley at once and to hold the balance until he had satisfied himself that the pending investigation had been dropped. Respondent at once thereafter returned to New York. Carroll paid $500 in cash to Coakley about noon on October 5, 1916, and advised Coakley that the respondent had deposited the further sum of $20,000 with him in cash in accordance with the arrangement previously made. On October 6, 1916, Carroll was advised by the district attorney that he had concluded that no further action should be taken against the Emerson Motors Company or the persons who had been engaged in the sale of its stock in Boston, and that the pending investigation would be dropped immediately. Thereupon Carroll paid over to Coakley the moneys deposited with him by respondent with the exception of $5,000 thereof which he, Carroll, retained for his personal use. From the alleged facts set forth it is charged that the respondent was guilty of misconduct as an attorney and counselor at law, in that, while acting as attorney for the company, he took part in a scheme improperly to induce the district attorney to abandon the investigation referred to.

The respondent's answer admits the payment of the money to Carroll, but denies specifically that the moneys were asked, offered or paid for other than legitimate purposes, and sets forth at length his version of the entire transaction.

The learned official referee summarizes the testimony as follows:

Robert P. Matches testified that in the fall of 1916 he was a stock and bond broker in Boston and was selling the Emerson Motors Company stock. An attorney by the name of Francis M. Carroll was his counsel. About September 22, 1916, he received a call from a police inspector and from him learned that he was investigating the Emerson Motors Company. Later Matches requested Carroll to find out whether there was an investigation or any trouble under way regarding himself or the Emerson Motors Company. Carroll informed Matches that there was only one lawyer in town whom he knew that could find out about the matter, and that was Mr. Daniel Coakley, a particular friend of his and also a particular friend of Mr. Pelletier, the district attorney, and that he would go to Mr. Coakley and find out, or have him find out, whether or not there was any trouble pending. Later Matches suggested to Carroll that he (Matches) telephone to New York and place the matter before the Emerson Company, which was done. As a result, Stephens, the respondent, came to Boston. On October 2, 1916, respondent conferred with Matches and was told

what Carroll had learned about the matter and what Matches knew about it. Carroll told Stephens that he had been to see Coakley and that Coakley was the one man in Boston who was in a position to get what he wanted out of the district attorney's office. A meeting was arranged later in the day, at which were present Coakley, Carroll, Stephens and Matches. Coakley stated in substance that the district attorney knew that the Emerson Motors Company had been carrying considerable fraudulent advertising. Coakley replied he was sorry the facts had not been presented to the district attorney and that it was too late, and all he could do was to use his influence with the district attorney. Respondent asked him if he would do this, to which Coakley agreed. Coakley also agreed to arrange a meeting between the respondent and the district attorney. Carroll brought up the question of retaining Coakley, who stated that he would take a retainer of $500, and that $20,000 in cash was to be placed in Carroll's hands to be paid to him provided he was in a position to see that no trouble or indictment came against the Emerson Motors Company or Matches. At a subsequent interview at the district attorney's office, Matches testified, the district attorney asked Coakley if he had been retained in the case, and Coakley replied that he had not as yet, that Stephens had to confer with his people first. The district attorney asked if the retainer had been arrived at, and Coakley said that he had impressed upon Stephens that the first amount he named was the amount, and that there was no need of arguing about it. After further discussion as to the cost of the motor car that had been used for exhibition purposes, and as they were leaving the office, the district attorney told Coakley to keep in close touch in regard to it. Respondent said he would go to New York and see his people and return the following day.

Coakley testified in substance that Carroll first brought the Emerson matters to his attention, and at his request he telephoned to Pelletier as to whether or not he had an investigation of the company going on, and Pelletier said in substance, "We have." He had known Carroll and Pelletier eight or ten years prior to that time, and his relations with Pelletier were friendly. At Carroll's request he arranged an interview at his, Coakley's, office between himself, Carroll, the respondent and Matches. During the conversation respondent asked Coakley to arrange an interview with Pelletier, which was done. Coakley denied practically all of the details of this interview, particularly that he had ever offered to use his influence with Pelletier. At the meeting with the district attorney the same persons were present. Pelletier remarked that

it was a stock-selling proposition rather than an automobile selling, so far as he could see it. Respondent also repeated what he had told Coakley previously. Coakley further testified that it was a common, every-day occurrence for him to go to the source where an investigation was going on and endeavor to stop that investigation, if he had the facts to justify him in stopping it; that he had succeeded in stopping very many investigations; that it was a part of his regular, every-day business. Coakley denied Matches' statement that Pelletier asked whether he, Coakley, had been retained, stating that what he had said was that he had just listened to respondent's story and requested Pelletier to listen to it. On the way to the elevator respondent asked Coakley, " What do you say, Coakley? On what terms would you take the case? " Coakley said: " You can give me a nominal fee — retainer, say $500. I will take this job on. I will do what I can with relation to accomplishing what you want. If what you tell me is true, that you have got practically all the money intact that came into the hands of the Emerson Motors Co., and have not dissipated it, I believe that if you can get me an American audit on that thing, as you tell me you have done, showing that you have got the money, that I may be able to make some arrangement with the District Attorney — the District Attorney having only in his mind what he has now disclosed to me — I think I may be able to accomplish what you want. If I am able to accomplish it you will owe me $20,000; and I want to be sure that that $20,000 is paid to me, and I want the assurance of somebody here that that money shall be mine. If Carroll will say to me, ' I will pay you that $20,000 if you are successful,' that is good enough for me, but I want to know that if I earn the money I will get it."

The respondent said he would have to go back to New York, not having authority to settle any fees or to agree to any fees, and that Coakley would hear from him through Carroll.

Pelletier also testified for the respondent and denied any impropriety or the receipt of any money.

The facts are that on the 2d of October, 1916, following information received at the New York office of the company from its agent in Boston that the district attorney in that city was investigating the methods adopted by the Emerson Company in advertising its stock in the Boston newspapers, at the request of the officers of the company, respondent left for Boston that evening, arriving there on the morning of October third. After the interviews heretofore alluded to, respondent returned to New York, arriving there on the morning of October fourth. He immediately submitted to the officers of the company Coakley's proposition,

and after discussion in which strong expressions were used as to the honesty of the proposition, it was decided to accept it. A check for the amount, $20,500, was drawn and cashed by the officers of the company, the bills handed to the respondent, and he returned to Boston that night. When he arrived in Boston on the morning of October fifth, he went directly to Carroll's office, gave him the $20,500 in bills, and waited there while Carroll went to Coakley's office and returned. Respondent did not see Coakley or Matches, the company's representative in Boston. He returned to New York on the same day. After Carroll had received the money Carroll went to Coakley's office and told Coakley that the money had been received. For himself he kept $5,000 and gave $15,000 to Coakley. On the next day Carroll was advised by Coakley and the district attorney that the investigation had been dropped and Carroll at once wrote to respondent that the district attorney " found no ground for criminal proceedings against the Emerson Motors Co."

This matter has been before this court for a considerable time and we have made a most careful, independent examination of the evidence. There were two proceedings herein before the learned official referee. Upon the first proceeding the referee reported in favor of the respondent upon the ground that as Matches, the broker, had been indicted and convicted in the United States court in New York for fraudulent use of the mails in connection with these Emerson Motors Company transactions in stock, his credibility was affected, although he had not been cross-examined at all by the respondent's counsel on the hearing before the referee. Further, as at that time, Pelletier, the district attorney, and Coakley stood before the court as reputable and successful practitioners, their testimony and denials of wrongdoing outweighed the testimony given in behalf of the petitioner. Some time after the testimony of Coakley and Pelletier was given before the official referee, and on October 27, 1921, the Attorney-General of Massachusetts brought a proceeding in the Supreme Judicial Court to remove Pelletier from his office as district attorney. The petition among other things set forth that Pelletier conspired with Coakley to extort from the Emerson Motors Company a large sum of money by threats of criminal prosecution, and the company in fear of such prosecution gave Coakley $20,500 to have such prosecution abandoned and thereupon Pelletier abandoned the prosecution. On the trial of that proceeding Pelletier appeared in person and by counsel. He offered no testimony or explanation of the charges against him. The court unanimously decided that he should be removed from his office, and in its decision found that he had been guilty

of malfeasance and misconduct in relation to the Emerson Motors Company investigation. (See *Attorney-General* v. *Pelletier*, 240 Mass. 264; 134 N. E. Rep. 407.) Subsequent to his removal and in November, 1921, a proceeding was instituted in the same court to disbar Pelletier on substantially the same grounds on which he had been removed from office. On the trial he appeared but failed to offer any testimony or explanation of the charges. The court adjudged him guilty and directed his disbarment. In September, 1921, a proceeding was instituted against Coakley to disbar him for unprofessional conduct as an attorney on charges similar to and which included the Emerson Motors Company transaction. In relation to that transaction it was specifically charged that he in conspiracy with the district attorney extorted the sum of $20,500 from the Emerson Motors Company as a fee for undertaking to use his personal influence with the district attorney to save the company from indictment. On the trial of the proceeding Coakley appeared and declined to offer any testimony. After due consideration the court found him guilty and decided that he be disbarred.

After the proceedings taken before the Supreme Judicial Court of Massachusetts, which resulted in the removal of Pelletier as district attorney and his disbarment, together with that of Coakley, came to the attention of the petitioner, a motion was made and granted by this court to reopen the proceeding and refer it back to the official referee upon the ground that such proceedings had destroyed the credibility of those witnesses upon whom the referee had relied. This court would not have accepted the conclusion of the learned referee stated in his first report if it had come to a decision. The necessary and inevitable conclusion from the conceded facts and the necessary inferences to be drawn from them would in our judgment have led to a finding of guilt.

As the matter now stands, Pelletier and Coakley having been disbarred by the Supreme Judicial Court of Massachusetts, not only has their credibility been affected, but as it appears that this identical transaction was involved in and a basis of such action by the Massachusetts court, that decision to our mind establishes the nature of the transaction as it occurred in Boston. Of course, the respondent was not there on trial, but all the circumstances of the case compel us to the conclusion that he knew exactly what he was about. Mr. Campbell, the president of the Emerson Motors Company, testified that when respondent came back from Boston, " Emerson called me in. He and Mr. Stephens had been in the office before I came in there. He called for me, and said that he must have $20,500 in cash, that there was a matter in Boston that would have to be taken care of immediately. ' Q. Did he say

anything more about the matter in Boston at that time?  A. Well, I said — I think you will find it in my former testimony, and I repeat it again — I said, " What in hell do you want of the $20,500." Q. What did he say to that?  A. " Well," he said, " it is a matter that we can't explain to you now  *  *  *." Q. Did Mr. Stephens characterize the connection between Mr. Coakley and the District Attorney in any way?  A. Well, he said, that Mr. Coakley was the man who would see the District Attorney or take care of the matter.  Q. Did he speak of him as a go-between?  A. No, I guess I did.  Q. You did?  A. I think so.  I may have said even worse than that.  Q. Well, did he or you say anything at that time in regard to the nature of the transaction, in Mr. Stephens presence?  A. Well, I just said, there I felt as though it was a hold-up and I do yet.  Q. You didn't characterize it in any other way?  A. I may have said " Blackmail " too.  Q. You think you did say " blackmail?"  A. I wouldn't doubt it.  I felt it. Q. What did Mr. Stephens say?  A. Mr. Stephens didn't say anything.  Col. Emerson replied to me.  Mr. Stephens may have said this, that it was necessary to have this amount of money in order to settle that matter up  *  *  *.  Yes, this is what he said — it would injure us if it went before the Grand Jury, which was true  *  *  *.  That conversation went along about as it will between three men who are a little wrought up over giving up $20,000.  Q. They were all wrought up, were they, over giving up $20,000?  A. Yes, absolutely.  Mr. Stephens was himself.' "

The Massachusetts court in the Pelletier removal proceeding (*supra*) said: " The use of bills in such large amounts rather than checks, in the practice of the law or in the ordinary transactions of life, is so unusual as to arouse suspicion in connection with other circumstances.  Neither the respondent nor Mr. Coakley was engaged in a kind of business where in the natural course of normal affairs large sums of bills would be used instead of checks. *  *  *.  Proof by such an inference [a legitimate inference] is no less sound proof than direct testimony. *Doyle* v. *Boston & Albany Railroad*, 145 Mass. 386; *Commonwealth* v. *Doherty*, 137 Mass. 245; *Barrett* v. *Bruffee*, 182 Mass. 229; *Commonwealth* v. *Asherowski*, 196 Mass. 342."

The learned official referee, in his report now before us, concludes as follows: " Taking into consideration all the facts disclosed by the evidence, the intimate relations which respondent had with his client, the Motors Company, the knowledge which he acquired of the character of its stock that was being advertised for sale in Boston, the celerity with which he acted on the information derived from Carroll that Coakley had personal and intimate relations with

the District Attorney and was the one man in Boston who could get the desired information, his accompanying Coakley to the district attorney and learning from him that he was investigating the sale of the Emerson Motors stock, his inquiries of Coakley as to the best means of stopping the investigation, Coakley's reply and statement of terms, and his (respondent's) ready compliance with those terms, his quick return to New York to procure the necessary money, his obtaining the money from the company notwithstanding strong expressions of dissatisfaction, his taking it immediately to Boston, not in form of check or draft or in any form of ordinary business transaction, but in the form of bills which had been provided to meet Coakley's terms, his delivering the same to Carroll, whom he knew but as a stepping-stone, his receiving prompt advice that the investigation had been dropped, all tend inevitably to impel the belief that respondent knew the money which he placed in Carroll's keeping was to be used and applied through the agency of Coakley to influence or induce the district attorney to discontinue or drop the investigation into the advertised sale of the Emerson Motors stock which he was then conducting. Any other or different conclusion would in my opinion be a violence to the rule which ordinarily governs men's actions and motives, particularly so in its application to the high order of intelligence and sharpened perception acquired by the respondent in his twenty-five years practice and experience at the Bar."

And he found the respondent guilty of the first charge in the petition in that he while acting as general counsel for the Emerson Motors Company gave to Daniel Coakley, an attorney in Boston, $20,500 of the company's money to influence or induce the district attorney of the county to suppress or discontinue an investigation into the advertised sale of the stock of the Emerson Motors Company.

There can be no doubt that the respondent knew exactly what was being done, namely, taking $20,500 in cash to Boston to give to the one man who had influence with the district attorney by virtue of his close personal and political relations to prevent official action by that district attorney, and his confidence was so well founded that the desired result was obtained twenty-four hours after the payment of the money. If this was his purpose in carrying through this transaction, it needs no argument to establish that it was unprofessional conduct.

We approve the finding of the learned official referee and it follows that the respondent should be disbarred.

DOWLING, SMITH, MERRELL and McAVOY, JJ., concur.

Respondent disbarred. Settle order on notice.